IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROQUE "ROCKY" DE LA FUENTE and ADANYS CLERCH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:16-CV-755-WKW [WO] |
| JOHN H. MERRILL, Secretary of State for the State of Alabama, | ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is Plaintiffs' Amended Complaint (Doc. # 7), which has been construed as containing a motion for a preliminary injunction. Plaintiffs challenge the constitutionality of Alabama's "sore loser" election statute, Ala. Code § 17-9-3(b), and seek declaratory and injunctive relief against its application. The parties briefed the matter on an expedited schedule (Docs. # 13, 14, 22), and an on-the-record telephonic hearing was conducted on September 27, 2016 (*see* Docs. # 19, 20). Faced with a looming deadline to reprint and distribute the ballots, on September 30 the court issued a truncated order denying injunctive relief. (Doc. # 23.) This Memorandum Opinion gives the reasoning behind that order.

# I.  JURISIDCTION AND VENUE

The court has subject-matter jurisdiction under 28 U.S.C. § 1331, and the parties do not contest personal jurisdiction.  Venue is proper under 28 U.S.C. § 1391(b).

# II.  BACKGROUND

## A.  <u>The Alabama Electoral Process</u>

Alabama has enacted comprehensive legislation governing access to the ballot.  Ala. Code § 17-1-1 *et seq.*  The complexities of ballot access and ballot printing bear on the context and equities of this case, and therefore merit in-depth discussion.

### 1.  *Accessing the Alabama Ballot: Certification and Sore Losers*

Would-be independent presidential candidates seeking access to the Alabama ballot turn to Title 17 of the Alabama Code for guidance.  *See* Ala. Code § 17-1-1 *et seq.*  Chapter 9 of that title sets out the procedure for getting an independent candidate's name on the ballot.  *See id.* § 17-9-3.  Candidates who wish to run in statewide elections must file with Defendant Secretary of State[1] ("the Secretary") a petition with a certain number of signatures of registered voters, due by a certain

---

[1] Plaintiffs' claims implicate legal analyses that hinge on the showing of various interests claimed by Defendant or by the State.  "[A] suit against a state official [like the Secretary] in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (internal citation omitted).  For purposes of clarity, the court occasionally refers to Defendant as the State, and to Defendant's interests as State interests.

date. *Id.* § 17-9-3(a)(3).   Once the petition is received, the Secretary sends a certification of the individual's candidacy to each of the state probate judges, who are tasked with "prepar[ing] the ballot[s]" bearing the names of the certified candidates. *Id.* § 17-9-3(b).

There is a catch, though: In addition to the signature requirement, an independent candidate may not appear on the general-election ballot if he or she "was a candidate in the primary election of that year." *Id.*  Under § 17-9-3(b),

> [t]he judge of probate may not print on the ballot the name of any independent candidate who was a candidate in the primary election of that year and the name of any nominee of a political party who was a candidate for the nomination of a different political party in the primary election of that year.

This provision, known as a "sore loser" law, requires candidates who compete in party primaries to stand by their commitment to that party.   Such laws are surprisingly common:   A recent academic study counted forty-seven states that "effectively bar[ ]" sore loser candidacies.  Michael S. Kang, *Sore Loser Laws and Democratic Contestation*, 99 Geo. L.J. 1013, 1043 (2011).

Alabama's sore loser law has been consistently applied for at least twenty-four years.  (*See* Doc. # 21 at 1.)  However, in 1992 Lyndon LaRouche was allowed to run for president in the general election as an independent candidate, despite participating in the Democratic primary earlier that year.  (Docs. # 1 at 9; 21 at 1; 22 at 5); Fed. Election Comm'n, Federal Elections '92, at 15 (1992).  The Secretary has

not offered any justification for Mr. LaRouche's inclusion on the ballot, other than the fact that it happened "a long time ago and [under] a different secretary of state." (Tr. at 25.)  Neither party has brought to the court's attention another sore-loser candidate who was allowed on an Alabama ballot (Tr. at 24–25), and the court's own research has not uncovered any other such candidacies.

## 2.    *The Ballot-Printing Process*

Once the Secretary's certified ballots reach the probate judges, the judges complete the ballots with the addition of local races for their respective counties, then order the printed ballots for that county.  (Doc. # 13-1 at 2.)  These orders go to Election Systems & Software ("ES&S"), a Nebraska company "specializing in election equipment, software, and services designed to support fair and efficient elections."[2]  (Doc. # 13-1 at 1.)  In the 2016 election cycle, "ES&S is providing equipment programming, ballot coding, ballot production, and ballot printing services" to the sixty-seven counties in Alabama.  (Doc. # 13-1 at 2.)  In addition to Alabama, ES&S also handles ballot-printing requests for "the majority of State governments in the United States," and several city governments as well.  (Doc. # 13-1 at 1.)

---

[2] Some counties handle certain aspects of the ballot-preparation process on their own. Jefferson County, for example, prints its own absentee ballots and programs its own election equipment.  (Doc. # 13-1 at 3–4.)  However, ES&S is the sole entity responsible for printing Alabama's Election Day ballots.  (*See* Doc. # 13-1 at 3.)

On receipt of the ballot order, ES&S begins the time-consuming process of preparing that county's ballots.  First, "ES&S performs equipment coding as well as ballot[ ] layout based on the election requirements and ballot style(s) requested by the county."  (Doc. # 13-1 at 2.)  This year, the sixty-seven counties in Alabama have ordered a total of 1066 styles of ballots, further complicating and extending the printing and preparation process.  (Tr. at 31.)  ES&S then "provides the county with its equipment coding election definition, test ballots to be used in testing the election definition, and a proof ballot or ballots(s) [sic] for the county's review and approval."  (Doc. # 13-1 at 2.)  After county approval of the election materials, "ES&S finalizes the equipment coding election definition and sends an electronic ballot file to [the] ES&S ballot production facility" in Birmingham.  (Doc. # 13-1 at 2.)  The facility then "prints the required quantity of each ballot style requested and approved by the county," packages the ballots by precinct as specified by the ordering county, wraps them in shrink wrap, and ships them to the county.  (Doc. # 13-1 at 2–3.)

As of September 19, 2016, ES&S had completed a significant portion of the ballots ordered by Alabama counties.  (Doc. # 13-1 at 3–4.)  All 218,300 absentee ballots had been printed and delivered to the counties; 2,388,350 Election Day ballots had been printed, representing the total order for fifty-six of the sixty-seven counties; and the ballots for fifteen counties had been packed and prepared for shipment.   (Doc. # 13-1 at 3.)   ES&S had also completed the equipment

programming for twenty-eight counties, which entailed the printing of 47,775 test ballots.  (Doc. # 13-1 at 4.)  All of this printing is done on ballot stock, a "specialized paper" that must be "ordered well in advance of elections and delivered to the printing facility ahead of time."  (Doc. # 13-1 at 5.)

### 3.    *The* **United States v. Alabama** *Remedial Order*

Further muddying the pre-election waters is the remedial order entered in *United States v. Alabama*, No. 2:12-CV-179-MHT-WC (M.D. Ala. Jan. 17, 2014), ECF No. 119, ("the Remedial Order") to enforce the requirements of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA").  UOCAVA protects the right of overseas citizens and members of the military to vote by absentee ballot in federal elections.  *See* 52 U.S.C. § 20301 *et seq.*  As amended by the Military and Overseas Voter Empowerment Act, Pub.L. No. 111-84, 123 Stat. 2190, 2318–35 (2009), UOCAVA requires in federal elections that each State "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election."  52 U.S.C. § 20302(a)(8).  Alabama's repeated failures to comply with the law led the Department of Justice to file suit against the State in 2012.  After years of negotiation, the parties agreed to the terms of the Remedial Order.

Two of the deadlines in UOCAVA and the Remedial Order are important to this case.  First, Alabama is required under the Order to ensure "that any electronic

ballot transmission system be fully operational not later than 55 days before any Federal primary or general election." Remedial Order, at 9. Second, under the terms of the Act itself, absentee ballots must be mailed to UOCAVA voters at least 45 days before the election—provided, of course, that the voter requested the ballot in question. 52 U.S.C. § 20302(a)(8)(A). To that end, the Remedial Order requires the State to conduct surveys and otherwise confirm that the counties have mailed their requested ballots. Remedial Order, at 11–12. The deadlines for all these efforts range from 55 to 41 days prior to the election. Counting backwards from the November 8, 2016 general election, the 41-day deadline passed on September 28, the 45-day deadline on September 24, and the 55-day deadline on September 14. Accordingly, any change to the ballot that affects the federal elections will jeopardize the State's compliance with UOCAVA and the Remedial Order. This action was filed 57 days before the election, only two days before the earliest of these deadlines.

### 4.  *The Emergency Re-Print*

A final element of confusion was thrown into the mix on September 26, when the Secretary learned that the language on the already-printed ballots did not comply with Alabama law. One of the measures on the 2016 ballot is Act No. 2016-145, a proposed amendment to the Alabama Constitution. The Act specified that three paragraphs were to be printed on Alabama ballots, but by mistake only one

paragraph was included.  (Doc. # 16 at 1.)  Upon learning of the omission, the Secretary certified the two missing paragraphs for inclusion on the ballot, thus requiring a reprint.  (Doc. # 16 at 1.)

Because of the misprint, all the election equipment must be re-programmed and the Election Day ballots discarded.  (Doc. # 16 at 2.)  To avoid confusion, the Secretary decided that paper absentee ballots that have already been mailed to voters will not be replaced; electronic absentee ballots, on the other hand, have already been corrected.  (Doc. # 16 at 2.)  Notwithstanding the financial and administrative headaches occasioned by the reprint, the parties contend that it does not affect an "election for Federal office" and accordingly does not call Alabama's UOCAVA compliance into question.  *See* 52 U.S.C. §§ 20302(a), 20310(3); (Tr. at 13–14).

## B.    Mr. De La Fuente's Run for President

Plaintiff Roque "Rocky" De La Fuente ran for nomination as one of the Democratic Party's candidates for President of the United States in Alabama's primary election on March 1, 2016.  (Doc. # 7 at 2.)  Unfortunately for the businessman-*cum*-politician, his performance in the primary did not match his ambition—Mr. De La Fuente garnered only 818 votes and lost the nomination to Hillary Clinton.  (*See* Doc. # 14 at 1); Alabama Democratic Party, Amended Certificate of Election Results for the Democratic Presidential Candidates, http://www.alabamavotes.gov/downloads/election/2016/primary/primaryResults

Certified-Amended-Democratic-2016-06-27.pdf (last visited Sept. 30, 2016) ("Democratic Primary Results"). Undeterred, Mr. De La Fuente continued his push for the White House, this time as an independent candidate. (Doc. # 7 at 1.) In that pursuit, Mr. De La Fuente collected the necessary signatures and prepared the required paperwork, ultimately submitting to the Secretary a petition to appear on the general election ballot. (Docs. # 7 at 4, 5; 13-3 at 1.)

Mr. De La Fuente submitted his petition at the proverbial "last minute" on the August 18 deadline. (Doc. # 13-3 at 1.) The Secretary's office, apparently overlooking Mr. De La Fuente's participation in the Democratic primary, initially added his name to the certification. (Doc. # 13-2 at 2.) On that basis, the Secretary's office called a representative of Mr. De La Fuente on August 24 or 25 to inform him that his name would be placed on the ballot. (Doc. # 13-3 at 1–2.) But on August 26, before the certifications were sent to the respective probate judges, the Director of Elections at the Secretary's office, Ed Packard, remembered that Mr. De La Fuente had competed in the primary. (Doc. # 13-2 at 2.) Accordingly, he removed Mr. De La Fuente's name from the certification on the basis that the sore loser law precluded his independent candidacy. (Doc. # 13-2 at 2.) Mr. Packard tried to contact Mr. De La Fuente that day to apprise him of his removal from the ballot, but was unable to reach him until August 29. (Docs. # 13-2 at 2; 13-3 at 2.) At Mr. De La Fuente's request, the Secretary's office sent him an email on the 29th, reflecting

the decision not to certify his name on the ballot.  The parties communicated for another couple of days, until the Secretary determined on or around September 1 that "the ballot printing should go forward without Mr. De La Fuente's name." (Doc. # 13-2 at 2.)

Mr. De La Fuente—along with Plaintiff Adanys Clerch, a "qualified and registered Alabama voter and an elector for Plaintiff De La Fuente"—filed a complaint under 42 U.S.C. § 1983 on September 12, 2016, alleging constitutional violations arising from his exclusion from the ballot under Alabama's sore loser law. (Doc. # 1 at 3, 12–13.)[3]  The date of filing the suit was a full 195 days after Mr. De La Fuente's primary loss.  Plaintiffs alleged violations of their rights of free speech and association as protected by the First and Fourteenth Amendments, their Fourteenth Amendment right of equal protection under the law, and Article II, Section 1, clause 5 of the United States Constitution (the Qualifications Clause), insofar as the statute imposes additional qualifications on presidential candidates. (Doc. # 7 at 12–13.)  Plaintiffs sought a declaratory judgment holding the sore loser law unconstitutional, as well as preliminary and permanent injunctive relief enjoining Defendant from denying Mr. De La Fuente's placement on Alabama's

_____

[3] Two days later, on September 14, Plaintiffs filed an amended complaint to correct a typographical error in the caption and first page of the complaint. (*See* Doc. # 7.)

ballot as an independent presidential candidate in the November 8, 2016 general election.[4]  (Doc. # 7 at 13.)

Two days after suit was filed, the court construed Plaintiffs' request for injunctive relief as including a motion for preliminary injunction and ordered Defendant to respond to the motion by September 23, 2016, nine days later (Doc. # 9), which he did (Doc. # 14).  Upon review of the response and an emergency notification filed by Defendant three days later (Doc. # 16), the court ordered an on-the-record telephone status conference which was held at 11:00 a.m. on September 27—a mere fifteen days after suit was filed and three days before Plaintiffs' reply brief was due.  During the status conference, the parties argued their respective (early) positions, agreed on a few basic facts, and informed the court of the exigencies and complications of reformatting, reprinting, and redistributing 1066 ballot styles in time for the November general election.  The parties also informed the court of the potential interplay of the UOCAVA Remedial Order, which further complicated matters.  In view of the extremely tight deadlines for reformatting and reprinting the ballots, the court committed to a ruling on the motion for preliminary

---

[4] Probate judges are the "chief election official[s]" in their respective counties, *see* Ala. Code § 17-1-3, and Defendant lacks legal authority to order these judges to print or not print their ballots in a certain way.  However, Plaintiffs' counsel made clear in the September 27 telephone hearing that Mr. De La Fuente is merely seeking an order that the Secretary certify his name on the ballot.  (Tr. at 22.)  Accordingly, the sixty-seven counties in Alabama are not necessary parties in this action.  *See* Fed. R. Civ. P. 19(a)(1).

injunction no later than Friday, September 30.  That ruling, denying a preliminary injunction, was filed at 5:33 p.m. on September 30.  (Doc. # 23.)

## III.  DISCUSSION

### A.    <u>Preliminary Injunction Standard</u>

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court."  *Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002).  To prevail on a motion for a preliminary injunction, the moving party bears the burden of demonstrating that:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cty. Sch. Bd.,* 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *Siegel v. LePore,* 234 F.3d 1163, 1167 (11th Cir. 2000)).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites."  *Id.*

Plaintiffs argue that "irreparable injury"—namely, Mr. De La Fuente's exclusion from the Alabama general-election ballot—would result unless an injunction issued.  (*See* Doc. # 7 at 11.)  Assuming without deciding that Plaintiffs meet that second element, the court's analysis will focus on (A) the equitable

considerations of the third and fourth elements of the preliminary-injunction standard, and (B) whether Plaintiffs have shown a substantial likelihood of success of the merits, in that order.

## B.   Equitable Considerations

The third and fourth elements of the preliminary-injunction standard ask the court to balance the equities of the case.  The third element looks to "the competing claims of injury," requiring the court to "consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  The fourth element looks to the effect of an injunction on the public interest, and commands courts to give "particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.* (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).

Plaintiffs' injury, should the injunction not issue, would be Mr. De La Fuente's exclusion from the Alabama general-election ballot.  Plaintiffs put significant resources into Mr. De La Fuente's appearance on the 2016 ballot— resources that would be wasted if the presidential hopeful were barred by the sore

loser law.  Moreover, interested voters like Ms. Clerch would be denied the opportunity to vote for their candidate of choice.[5]

If the requested injunction were granted, Defendant's injuries would include the declaration of a voting law to be unconstitutional, and the court-ordered reprinting of ballots bearing Mr. De La Fuente's name.  Reprinting ballots would ordinarily pass "significant additional costs" onto the shoulders of the counties (Doc. # 13-1 at 5–6) and jeopardize the State's compliance with UOCAVA, *see* Part II.A.3., *supra*.  But, because of the emergency reprint already ordered by the Secretary, *see* Part II.A.4., *supra*, the State of Alabama would likely suffer no additional harm if Mr. De La Fuente's name were added to the reprinted ballots.[6]

However, declaring unconstitutional an otherwise validly adopted state election statute that is part of an interrelated legislative scheme would be a more serious intrusion into the affairs of a state.  Mr. De La Fuente's assertion that

---

[5] Plaintiffs did not favor the court with an explanation of the hardships they hoped to avoid. Instead, they analyzed the burden placed on their associational rights and argued that Defendant would suffer "virtually no[ ]" prejudice if the injunction were granted.  (Doc. # 22 at 27–30.) Neither argument bears on Plaintiffs' hardship: the former goes to the merits of Plaintiffs' challenge, and the latter goes to Defendant's hardship if the injunction were granted.  Regardless, the court is satisfied that Plaintiffs would be injured if Mr. De La Fuente were excluded from the ballot.

[6] The Secretary does not plan to reprint the absentee paper ballots already placed in the mail (Doc. # 16 at 2), so an injunction requiring the reprinting of these absentee ballots would cause the State some additional injury.  To avoid such a result, during the September 27 telephone hearing Plaintiffs' counsel offered to waive the reprinting of these ballots, and have Mr. De La Fuente's name certified for addition to the electronic ballots and Election Day ballots only.  While such a waiver would likely be ineffective—after all, Mr. De La Fuente cannot waive the rights of the UOCAVA voters—the issue is not before the undersigned.

"virtually no[ ]" prejudice would result to Alabama if one of its statutes were to be declared unconstitutional shortchanges the principles of comity and balance between state and federal powers.  Injunctions are "drastic remed[ies]" not to be entered lightly; an injunction declaring a state statute unconstitutional requires even greater caution by a federal court.  *See Am. Civil Liberties Union of Fla., Inc.,* 557 F.3d at 1198.   Declaring  such,  on  short  notice  with  little  briefing,  would  be  highly prejudicial to the state, and inflict significant injury if it were in error.[7]  Thus, when considered  along  with  potential  UOCAVA  compliance  problems,  granting  the requested  injunction  would  potentially  cause  the  State  significant  injury,  clearly outweighing the harm to Plaintiffs.

Turning to the public-interest inquiry, "the injunction would not [have] be[en] adverse to the public interest" if constitutionally sound and timely issued.  *Am. Civil Liberties Union of Fla., Inc.*, 557 F.3d at 1198.  This late in the election process, the greatest concern with respect to the public is whether any newly printed ballots could reach the electorate in time for an orderly November 8 election; adding an 818-vote candidate  to  the  ballot  does  not  outweigh  the  risk  of  confusing  or  even disenfranchising thousands of Alabama voters.  In the September 27 telephone hearing, counsel for Defendant represented to the court that ES&S could print and

---

[7] As will be seen, this idea bears on the public-interest discussion and the likelihood-of-success analysis as well.

ship the ballots in time for the election if it received notice by the "drop-dead date" of Friday, September 30.  (Tr. at 32.)  This representation was not challenged by Plaintiffs.   Additionally, ES&S already had to reprint the ballots because of the Secretary's error in omitting a substantial portion of a proposed state constitutional amendment, so a court-ordered reprint to include Mr. De La Fuente would not create a heightened risk of failing to distribute the ballots by November 8.  Accordingly, the court finds that injunctive relief would not add additional harm to the public interest, so long as the injunction issued on or before September 30.

However, Mr. De La Fuente's delay in filing this action is another matter, one of great import.  While it is true that Alabama, for reasons unrelated to this case, will have to reprint and distribute over 2.7 million ballots before November 8, that does not relieve Mr. De La Fuente of all the equitable baggage created by his delay in filing this challenge.  True, Alabama must reprint the ballots, with or without Mr. De La Fuente being listed.  But also true, the Secretary can point to significant injury if a state statute is wrongly declared unconstitutional, and to the prejudice the State could suffer as a result of unresolved UOCAVA issues related to the Remedial Order.  And the equities extend further.  The court was compelled to rule on a preliminary injunction as to the constitutionality of a state statute in, essentially, a week—including briefing and a rushed telephone hearing.  Mr. De La Fuente was defeated in the Democratic primary on March 1, 2016.  As early as March 2,

16

Plaintiffs knew that the sore loser law would apply on its face to bar Mr. De La Fuente's independent candidacy.[8]  *See Reform Party of Ala. v. Bennett*, 18 F. Supp. 2d 1342, 1356 (M.D. Ala. 1998) ("[C]andidates for office have a responsibility to ascertain what the law is and follow it.").  Instead of filing suit then, Plaintiffs waited until September 12—a 195-day delay that left the court only eighteen days to rule before the drop-dead date.  (*See* Tr. at 32.)  Granting an injunction "is the exception rather than the rule," owing to the "extraordinary and drastic" nature of the remedy. *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).  Given the stakes, which include invalidating a state law under the federal constitution and ordering the timely reprinting of millions of ballots, Plaintiffs' requested injunction could only be granted after careful and deliberative reasoning.  Plaintiffs' delay denied the court the opportunity to conduct such a searching review, and accordingly harmed the public interest in well-reasoned and accurate judicial decision-making.  Relatedly, Defendant was unable to marshal law and facts in support of its position—on a

---

[8] In the September 27 telephone hearing, Plaintiffs' counsel argued that Mr. De La Fuente was aware that the law had not been enforced against Lyndon LaRouche in 1992, and accordingly assumed it would not be applied against him.  (Tr. at 25–26; *see also* Doc. # 22 at 10–12.)  This logic ignores a fundamental canon of statutory interpretation:  Desuetude does not rob a statute of its legal effect.  *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113–14 (1953) ("The failure of the executive branch to enforce a law does not result in its modification or repeal."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 339 (2012) ("A statute is not repealed by nonuse or desuetude.").  Similarly, a state trooper who lets a speeding motorist pass has not just repealed the state traffic laws; he can still pull over the next driver who breaks the speed limit.  Whether Mr. De La Fuente's delay resulted from a mistaken view of the law or bad faith, "[h]e who comes into equity must come with clean hands."  *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933).

facially valid statute—on such short notice.  And a bond would not cure these deficiencies.

On denial of Plaintiffs' injunction, Mr. De La Fuente remained off the ballot; months of his work were wasted, and voters like Ms. Clerch were denied the opportunity to vote for their favored candidate.  But the potential injury to Defendant outweighed the potential injury to Plaintiffs, in view of the public interest.  *See Winter*, 555 U.S. at 24.  By delaying the filing of suit, Plaintiffs asked the court to make a slapdash determination that a state law violated the federal Constitution—a result that, as far as the court can tell, is unparalleled in the federal sore loser law jurisprudence.  An error in judgment brought about by the hurried decision-making process would deny the public its interest in enforcement of its election laws, and in having federal courts properly apply the Constitution.  This is one of the rare "public interest[s] for whose impairment, even temporarily, an injunction bond cannot compensate," and accordingly the court is justified in "withhold[ing] relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."  *Weinberger*, 456 U.S. at 312–13 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  The court therefore finds that Plaintiffs have not "clearly establishe[d] the burden of persuasion" on the fourth element of the injunction standard, and accordingly the motion for preliminary injunction was denied.

**C.** __Likelihood of Success on the Merits__

Even were the balance of hardships to weigh in favor of injunctive relief, an "injunction should never issue if there is no chance that the movant will eventually prevail on the merits." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).[9]  Plaintiffs have alleged claims arising under the Qualifications Clause, the First Amendment (as incorporated by the Fourteenth Amendment, *see Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931)), and the Equal Protection Clause of the Fourteenth Amendment.  (Doc. # 7 at 12–13.)  The court will address Plaintiffs' likelihood of success on each claim, but will start with Plaintiffs' two easily dismissed ancillary claims.

First, the court addresses the so-called "due process/reliance/waiver/estoppel argument."  (Doc. # 22 at 7 n.3.)  Plaintiffs have argued for a species of estoppel based on Lyndon LaRouche's inclusion on Alabama's 1992 general-election ballots despite his defeat in the Democratic presidential primary of that year.  (Doc. # 22 at 10–12.)  In support of this argument, Plaintiffs cite cases for the proposition that it is unconstitutional to "change the rules of the game and apply them retroactively." (Doc. # 22 at 12.)  But in this argument Plaintiffs injure their own feet.  At all relevant times, Alabama's sore loser statute has remained on the books and in effect; to deem

---

[9] Decisions handed down by the former Fifth Circuit prior to October 1, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

it inapplicable would be the sort of unconstitutional rule-changing that Plaintiffs decry.  Plaintiffs point to Mr. LaRouche's candidacy and complain that "there has been no announcement of or explanation for a different policy for 2016 or for M.r [sic] De La Fuente."  (Doc. # 22 at 7 n.3.)  This logic is upside-down.  Mr. LaRouche's unexplained general-election candidacy did not invalidate the sore loser law or establish a policy of non-enforcement that had to be rolled back by announcement.  *John R. Thompson Co.*, 346 U.S. at 113–14; *Dep't of Public Safety v. Freeman Ready-Mix Co.*, 295 So. 2d 242, 247 (Ala. 1974) ("[P]opular disregard of a statute, or a custom opposed to it, will not repeal it.") (citation omitted).  If Plaintiffs seek an announcement of Alabama's 2016 policy on sore loser candidacies, it can be found in § 17-9-3.

Second, Plaintiffs contend that "Defendant's application of the [sore loser] statute is erroneous . . . because the true candidates in presidential primaries are candidates for Delegate to a national presidential convention, whereas the true candidates on the general election ballot in November are candidates for Presidential Elector."  (Doc. # 7 at 10; *see also* Doc. # 22 at 10; Doc. # 22-2 at ¶ 7.)  This overly formalistic approach has been rejected by multiple courts.  "Notwithstanding the involvement of the electoral college in the process, the individual whose name appears on the ballot . . . is the only 'candidate.'"  *Libertarian Party of Mich. v. Johnson*, 905 F. Supp. 2d 751, 761 (E.D. Mich. 2012); *see also* Ala. Code § 17-14-

31(c) (requiring electors to certify that they will only cast their ballots for the candidates with whom they are associated).  The Supreme Court's treatment of a similar argument provides further support for this position.  *Storer v. Brown*, 415 U.S. 724, 738 n.9 (1974) (rejecting argument that only presidential electors, not presidential candidates, had standing to challenge election law).[10]  Accordingly, Plaintiffs have failed to demonstrate a substantial likelihood of success on the estoppel and candidate-versus-electors arguments.

### 1.    *Qualifications Clause*

The Qualifications Clause lays down the sole qualifying criteria for the office of President of the United States.  U.S. Const., art. II, § 1, cl. 5.  Set out in full, the text reads:

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

*Id.*  As explained by the Supreme Court, "the Qualifications Clauses were intended to . . . fix as exclusive the qualifications in the Constitution."  *U.S. Term Limits, Inc.*

---

[10] And even if Plaintiffs were correct in their reading of the statute, the court lacks the power to command state officials to obey a federal interpretation of state law.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

*v. Thornton*, 514 U.S. 779, 806 (1995).[11]   States do not "possess the power to supplement the exclusive qualifications set forth in the text of the Constitution."  *Id.* at 827.  But the jurisprudence also draws a thick, if sometimes blurry, line between permissible ballot-access regulations and unconstitutional qualifications for office. *E.g.*, *Storer*, 415 U.S. at 746 n.16 (rejecting as "wholly without merit" the argument that a California disaffiliation statute, characterized as a ballot-access regulation, violated the Qualifications Clause as applied to federal congressional elections).

*Term Limits* did not give *qualifications* a precise definition. 514 U.S. at 829. In that case, the Court heard a challenge to an Arkansas constitutional amendment that imposed term limits on candidates for federal congressional office.   The petitioners argued, citing *Storer*, that the amendment did not create an absolute legal bar because candidates could still win election through a write-in campaign; therefore, the amendment did not run afoul of the Qualifications Clauses.  *Id.* at 830–31.  The Court used the petitioners' definition of *qualifications* to strike down the amendment, but expressly reserved judgment on the definition's validity.  *Id.* at 829 ("We need not decide whether petitioners' narrow understanding of qualifications is correct because, even if it is, Amendment 73 may not stand.").

---

[11] The *Term Limits* decision dealt with the congressional Qualifications Clauses, U.S. Const. art. I, § 2, cl. 2; U.S. Const. art. I, § 3, cl. 3.  514 U.S. at 782–83.  But the decision's rationale applies with equal force to the presidential Qualifications Clause, which is nearly identical to the congressional clauses in language and scope.  *Compare* U.S. Const. art. II, § 1, cl. 5 *with* U.S. Const. art. I, § 2, cl. 2 *and* U.S. Const. art. I, § 3, cl. 3.

Keying on the "absolute bar" analysis and other language in *Term Limits* referring to the "handicapping [of] a class of candidates," the Ninth Circuit fashioned a two-part test to analyze Qualifications Clause challenges. *Schaefer v. Townsend*, 215 F.3d 1031, 1035 (9th Cir. 2000), *cert. denied sub nom Jones v. Schaefer*, 532 U.S. 904 (2001). But the Eleventh Circuit rejected this test, reasoning that the standard was rooted in the *Term Limits* petitioners' proposed definition of *qualifications* that the Court declined to adopt. *Cartwright v. Barnes*, 304 F.3d 1138, 1143 (11th Cir. 2002). Rather, the *Cartwright* decision looked to *Term Limits* and *Storer* for the principle that the "certain types of ballot access restrictions that are election procedures" do not impose unconstitutional qualifications for office. *Id.*

*Cartwright* guides the court's Qualifications Clause inquiry. Not only is the *Cartwright* procedural-substantive distinction binding precedent, it accurately captures the election-law jurisprudence in light of the *Term Limits* decision. *See Term Limits*, 514 U.S. at 835 ("The provisions at issue in *Storer* and our other Elections Clause cases were thus constitutional because they regulated election *procedures* and did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position.") (emphasis in original); *accord Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 777 (7th Cir. 1997) ("[W]here requirements are procedural in nature and do not add substantive qualifications, they do not violate the Qualifications Clause.") (citing *Term Limits*,

23

514 U.S. at 835).  Under this rubric, the Alabama sore loser statute does not reach, let alone cross, the constitutional line.

To start, the sore loser law does not address itself to any substantive characteristic like residency or prior felony convictions.[12]  Rather, the law looks only to the candidate's participation in the primary elections of that specific election cycle.  *Storer* offers an instructive comparison.  At issue in *Storer* was a California statute that excluded from the ballot any independent or party-sponsored candidate who had been affiliated with a different political party in the twelve months preceding the primary election.  415 U.S. at 727.  The Supreme Court upheld this so-called disaffiliation law, *id.* at 737, a result that *Term Limits* noted with approval. 514 U.S. at 835 (reasoning that the disaffiliation statute "did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position").  If the disaffiliation statute passes constitutional muster, so must the sore loser law.  The disaffiliation statute was based on mere party membership, which can reflect actions taken well before the election that are grounded in personal beliefs rather than preparations to run for office.  The sore loser law is based on the candidate's performance in primary elections—something that

---

[12] *Cf.*, *e.g.*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) (invalidating residency requirement under the Qualifications Clause); *Schaefer*, 215 F.3d 1031 (same); *Application of Ferguson*, 294 N.Y.S.2d 174 (Super. Ct. 1968) (invalidating restriction on candidacy of convicted felons); *Danielson v. Fitzsimmons*, 44 N.W.2d 484 (Minn. 1950) (same).

only results from taking an affirmative step down a certain route to the general-election ballot.  Whereas the sore loser law looks to how the candidate has proceeded in the instant election, the disaffiliation statute looks more broadly to the candidate's recent political history.  *See Storer*, 415 U.S. at 735 (explaining that primaries "[are] not merely an exercise or warm-up for the general election but an integral part of the entire election process").  Thus, if the disaffiliation statute does not impose a substantive qualification on candidacy, neither does the sore loser law.  Rather, the sore loser law "no more establishes an additional requirement for the office of [President] than the requirement that the candidate win the primary to secure a place on the general ballot or otherwise demonstrate substantial community support."  *Id.* at 746 n.16.

This brings the inquiry to another important characteristic of the sore loser law: its basis in electoral support.  The law's exclusive effect kicks in only after a candidate tries and fails to win nomination in a primary election.  Ala. Code § 17-9-3(b).  In this way, the law is not so different from Alabama's requirement that independent candidates submit a certain number of signatures to qualify for office—an unquestionably constitutional requirement, *see Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) ("States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office.").  Candidates who wish to run as

independents must gather signatures; candidates who wish to run as party affiliates must gather enough votes to win the primary. If either candidate fails this test of electoral support, he or she cannot access the general-election ballot. The sore loser law is not a "measure[ ] that exclude[s] candidates from the ballot without reference to the candidates' support in the electoral process." *Term Limits*, 514 U.S. at 835. Rather, the law is a "permissible procedural regulation of the manner in which candidates may obtain ballot placement," *Cartwright*, 304 F.3d at 1144, and accordingly is not an unconstitutional qualification. Plaintiffs therefore failed to show a substantial likelihood of success on their Qualifications Clause argument.[13]

### 2. *First and Fourteenth Amendments*

It is beyond cavil that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983). Voting rights are "heavily burdened" if voters may only choose between major-party candidates when other candidates "are clamoring for a place on the ballot." *See Williams v. Rhodes*, 393 U.S. 23, 31 (1968). Similarly, excluding a candidate from the ballot burdens voters' associational rights "because an election campaign is an effective platform for the expression of views on the issues of the

---

[13] In support of their Qualifications Clause argument, Plaintiffs cite *Benesch v. Miller*, a state-court case from Alaska, for the proposition that a sore loser law violates the Qualifications Clause when applied to a U.S. Senator. 446 P.2d 400 (Alaska 1968); (*see* Doc. # 22 at 16). The perfunctory analysis in *Benesch* does not persuade, and the case was arguably overruled by the later-decided *Storer* opinion. *See* 415 U.S. at 746 n.16. Regardless, *Benesch* does not compel a different result here.

day, and a candidate serves as a rallying-point for like-minded citizens." *Anderson*, 460 U.S. at 788. "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Id.* (quoting *Storer*, 415 U.S. at 730). "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).

There is no bright-line rule or "litmus-paper test" to determine whether a state election law violates the associational rights guaranteed by the First and Fourteenth Amendments. *Storer*, 415 U.S. at 730. Rather, courts "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). If the burden is too severe, strict scrutiny will apply—the regulation must be narrowly tailored and advance a compelling state interest. *Burdick*, 504 U.S. at 434. But a lesser burden will be reviewed under an intermediate standard of review, under which "a State's 'important regulatory interests' will

usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434).

Alabama's sore loser statute does not impose a severe burden that would trigger strict scrutiny; rather, it is the sort of "evenhanded restriction[ ]" that the Supreme Court has upheld time and again.  *See Anderson*, 460 U.S. at 788 n.9; *accord Johnson*, 905 F. Supp. 2d at 760 (finding Michigan's substantially similar sore loser statute did not impose a severe burden on associational rights when applied to bar presidential candidacy); *Nat'l Comm. of U.S. Taxpayers Party v. Garza*, 924 F. Supp. 71, 74 (W.D. Tex. 1996) (finding the same for Texas's sore loser statute).  It cannot be over-emphasized that Mr. De La Fuente is only barred from the ballot because of his voluntary participation in the Democratic Primary. Plaintiffs claim that Mr. De La Fuente's "goal at all times was to be on Alabama's general election ballot for President in [2016].[14]"  He could have achieved this goal by following the independent-candidate procedures for ballot access, without fear of being barred from the ballot by a lack of support.  The court declines to find a severe burden here, where the burden stems from the candidate's own choices in how to best manage his bid for President.  Moreover, Alabama's sore loser law does not discriminate against independent candidates—if anything, these candidates face an

---

[14] Plaintiffs' brief reads, "His goal at all times was to be on Alabama's general election ballot for President in 1992."  (Doc. # 22 at 6.)  The court assumes that Plaintiffs mean *2016*, and that *1992* was a typographical error caused by this case's expedited schedule.

easier path to the ballot, as the 5,000 required signatures will almost always be lower than the votes necessary to win a primary election.[15]  *See* Ala. Code § 17-14-31(a). Therefore, the court's inquiry is limited to whether the State's "important regulatory interests" justify this "reasonable, nondiscriminatory restriction[ ]."  *Timmons*, 520 U.S. at 358 (citation omitted).

Defendant has asserted several State interests: "promoting fair and honest elections"; "maintaining the integrity of various routes to the ballot"; "attracting the national political parties to participate in the Alabama's [sic] primary elections"; and "temper[ing] the destabilizing effects of party splintering."  (Doc. # 14 at 9–10 (citations and internal quotation marks omitted).)  Each of these interests has been recognized as valid in the election-law jurisprudence.  *See, e.g.*, *Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 433; *Storer*, 415 U.S. at 730.  But Plaintiffs challenge the sufficiency of this assertion, citing Eleventh Circuit cases requiring a particularized showing of State interests in the presidential-election context so that the court can analyze their weight and legitimacy.  (Doc. # 22 at 11, 28–29); *see* *Green Party of Ga.*, 551 F. App'x 982 (11th Cir. 2014) (unpublished); *Fulani v.*

---

[15] By contrast, in Alabama's 2016 primary election Donald Trump received 373,721 votes and Hillary Clinton received 311,141 votes.  Alabama Republican Party, Certification of Results, http://www.alabamavotes.gov/downloads/election/2016/primary/primaryResultsCertified-Republican-2016-03-11.pdf (last visited Sept. 30, 2016) ("Republican Primary Results"); Democratic Primary Results, *supra*.  Five other candidates received significantly more than 5,000 votes: Ted Cruz, with 181,479 votes; Marco Rubio, with 160,606; Ben Carson, with 88,094; Bernie Sanders, with 76,878; and John Kasich, with 38,119.  Republican Primary Results, *supra*; Democratic Primary Results, *supra*.

*Krivanek*, 973 F.2d 1539 (11th Cir. 1992); *Bergland v. Harris*, 767 F.2d 1551 (11th Cir. 1985). However, the Supreme Court has also stated that it "ha[s] never required a State to make a particularized showing" of common State interests like "voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194–95; *see also Swanson v. Worley*, 490 F.3d 894, 912 (11th Cir. 2007). Moreover, to the extent Plaintiffs complain of Defendant's lack of evidentiary support for the sore loser law, Plaintiffs are charged with the creation of time-sensitive deadlines resulting in less than a full development of the facts and final consideration of their claims.[16] In sum, Defendant has asserted important State interests, which have been honored repeatedly by the federal judiciary, and which justify the sore loser law's reasonable regulation of ballot access.

Finally, Plaintiffs argue that "history shows no problem caused by allowing presidential candidates who have run and lost in a party primary election to get on the general election ballot for President," and that the State therefore lacks an interest in enforcing the sore loser law. (Doc. # 22 at 26.) This position puts blinders on the

---

[16] A contrary result would incentivize the late filing of challenges to ballot-access laws. If the court were to find that Defendant's hurried evidentiary production failed to show a State interest justifying the sore loser law, it would write a blueprint to success for weak or baseless challenges to ballot-access regulations. A plaintiff could file suit on the eve of the general election, angling for a favorable judgment on the basis of the State's rushed submissions in support of its regulatory interests rather than the validity of the law itself. Such a result would stretch thin the court's already scarce resources, and will not be condoned.

State legislature, forcing it to think retrospectively and not prospectively.  Rather, the State "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."  *Burson v. Freeman*, 504 U.S. 191, 209 (1992) (quoting *Munro*, 479 U.S. at 195–96).  Arguably, allowing Mr. De La Fuente on the general-election ballot would not cause significant problems (if one ignores the invalidation of an election statute), largely due to his minor political stature.  *See* Democratic Primary Results, *supra* (tallying the 818 votes cast for Mr. De La Fuente).  But if Ted Cruz, Marco Rubio, or Bernie Sanders asked the court to do the same thing, Alabama would undergo the chaotic political "splinter[ing]," "feud[ing]," and "factionalism" that sore loser laws seek to avoid.  *See Storer*, 415 U.S. at 736.[17]

---

[17] Justice White explained in *Storer* the importance of sore loser laws in the greater context of the American political arena:

> The direct party primary . . . is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers.  I[t] functions to winnow out and finally reflect all but the chosen candidates.  The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences.  *The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds*.  The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified.  The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively.

Notwithstanding Plaintiffs' arguments to the contrary, the State's regulatory interests justify the reasonable burdens imposed by the sore loser law. Accordingly, Plaintiffs cannot show a substantial likelihood of success on the merits of the First and Fourteenth Amendment claims.

### 3.   *Equal Protection Clause*

Plaintiffs' equal-protection claim suffers the same fate as their associational-rights claim, because both are reviewed under the same standard. In *Anderson*, the

---

415 U.S. at 735 (emphasis added).

> Moreover, sore loser statutes protect

> [t]he direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an 'independent' candidate to capture and bleed off votes in the general election that might well go to another party.

> . . . California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government. *See* The Federalist, No. 10 (Madison). It appears obvious to us that the one-year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as outweighing the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status. Nor do we have reason for concluding that the device . . . was not an essential part of its overall mechanism to achieve its acceptable goals. As we indicated in *Rosario* [*v. Rockefeller*, 410 U.S. 752 (1973)], the Constitution does not require the State to choose ineffectual means to achieve its aims. To conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot.

*Id.* at 735–36.

touchstone associational-rights opinion, the Supreme Court cribbed its analysis from prior equal-protection analyses of voting-rights issues. *See* 460 U.S. at 786 n.7 ("We rely . . . on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment."). The *Anderson* standard proved so useful in the associational-rights context that the Court ultimately closed the loop and began using *Anderson* to analyze whether state election laws violated the Equal Protection Clause of the Fourteenth Amendment. *E.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–91 (2008); *Fulani*, 973 F.2d at 1543 ("In [the Eleventh] Circuit . . . equal protection challenges to state ballot-access laws are considered under the *Anderson* test."); *see also Reform Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 174 F.3d 305, 314 (3d Cir. 1999) (concluding that "burdens [on voting rights] require the same level of scrutiny in an equal protection analysis that they do in an associational rights analysis"). As a result, an analysis under the Equal Protection Clause follows the same lines as an analysis under the First and Fourteenth Amendments. Therefore, because Plaintiffs have failed to show a substantial likelihood of success on their First and Fourteenth Amendment claims, they similarly cannot meet this burden with respect to their Equal Protection claim.

## IV.  CONCLUSION

Plaintiffs failed to "clearly establish[ ] the burden of persuasion" as to the elements of the preliminary injunction standard. *Am. Civil Liberties Union of Fla.,*

*Inc.*, 557 F.3d at 1198.  Accordingly, on September 30, 2016, Plaintiffs' motion for preliminary injunction (Doc. # 7) was denied (Doc. # 23).

      DONE this 7th day of October, 2016.

                        /s/ W. Keith Watkins
                     CHIEF UNITED STATES DISTRICT JUDGE